UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON

CIVIL ACTION NO. 06-47-DLB

ANDREW FLEGE, ET AL.                                          PLAINTIFFS

vs.                    MEMORANDUM OPINION & ORDER

WILLIAMSTOWN INDEPENDENT
SCHOOLS, ET AL.                                               DEFENDANTS

* * * * * * * * * * * * * * *

## I.   INTRODUCTION

Plaintiffs, Andrew Flege ("Mr. Flege"), Dena Flege ("Mrs. Flege"), and their three

minor children (the "Flege children"), bring this § 1983 action against Defendants,

Williamstown Independent Schools, Charles Ed Wilson ("Supt. Wilson"), individually and

in his official capacity as Superintendent, and David Poer ("Mr. Poer"), individually and in

his official capacity as Principal of Williamstown Elementary School ("WES"), alleging

multiple constitutional violations and state law claims.  This matter is presently before the

Court upon Defendants' Motion for Summary Judgment (Doc. # 30).  Plaintiffs have filed

a Response (Doc. # 33),[1] to which Defendants filed a Reply (Doc. # 35).  Oral argument

---

[1] In a not-so-subtle attempt to circumvent the Joint Local Rules, namely Rule 7(d), Plaintiffs filed a Response that, although technically 39 pages in length without a "fact" section, effectively exceeded the 40 page limit by way of an attached, 14-page exhibit entitled "Chronology of Relevant Events."  Plaintiffs' actions, without Leave of this Court, constitute a violation of the Joint Local Rules of Civil Practice and Plaintiffs are hereby admonished to refrain from future infractions.

was held on Defendant's Motion on February 16, 2007.  Therefore, the motion is ripe for the Court's review.

## II.    FACTUAL BACKGROUND

During the 2004-2005 academic year, Mr. and Mrs. Flege had three children who were students at WES.  The oldest child was in the 4th grade, and the two youngest children (twins) were in the 2nd grade.  Near the end of the school year, the Fleges voluntarily removed their children from school over a dispute surrounding the school's attendance policies.  The Flege children were home-schooled upon being removed from WES by Mrs. Flege and are currently enrolled in the Walton-Verona school district.

Over the course of the 2004-2005 school year, the Flege children were tardy arriving to school five times.  Three of the tardies – those occurring on February 14, October 1, and April 11 – were considered "excused" by the school, two of which were based on an electricity outage reported by the Fleges resulting in an inoperable alarm clock.[2]  But the other two tardies, which occurred on December 7 and May 4, were marked as "unexcused" because traffic was given as the reason for the first and the Mrs. Flege refused to provide a reason for the latter tardy.  In addition, the Fleges failed to pick up their children in a timely fashion at the end of the school day on numerous occasions, requiring school staff to supervise the children beyond their ordinary responsibilities.  Despite the availability of school bus service, the Fleges drove their children to and from school on most days because their home is only approximately two miles from WES.

---

[2] Mr. Poer claims in his deposition that the school contacted the local power company following the second excused tardy for a power outage and that the power company did not have any records of an outage in the area of the Flege's home.  Nevertheless, the school did not alter the "excused" designation of the particular tardy.

Although the record is unclear as to when and how many incidents of tardiness occurred during previous school years, the record does indicate that the Flege children had received both excused as well as unexcused tardies in the past, for which detention was assigned.[3]  As a result, the dispute between the Fleges and WES regarding detention for tardiness arose prior to the 2004-2005 school year when Mrs. Flege first questioned Mr. Poer about the tardy policy following a detention assignment for the Flege's oldest child during the 2001-2002 school year.  Mr. Poer, who was previously employed as a music teacher in the Williamstown schools, has served as Principal of WES since 1998 and is certified under Kentucky law.

During the relevant school years, including the 2004-2005 school year, there were various policies in place on the subject of tardiness both at WES and for the Williamstown Schools district-wide.   The primary controversy in this matter stems from arguably conflicting tardiness policies for the Williamstown School District and WES, which is part of the larger School District.  Specifically, the Williamstown School District discipline code ("District Code of Conduct" or "DCOC") stated in pertinent part:

> Tardiness will not be tolerated in the Williamstown School.  This school is dedicated to teaching and modeling a strong work ethic.  Being on time is essential when students make the transition from school to the world of work.  Tardiness is also disruptive to the routine of the school. . . .
> Tardiness will be "excused" only in emergency or extraordinary circumstances.  (ONLY 2 parent notes will be accepted per semester for excused tardies). . . .

---

[3] Tardy slips are completed by administration staff who work in the school's main office. Each slip is supposed to indicate the time the child arrived at school and the reason for the late arrival.  The reason for the late arrival is to be supplied by the parent at which time the staff determines whether or not the reason warrants an "excused" or "unexcused" designation based on established guidelines as to what does or does not constitute an excused tardy.

> Students with "unexcused" tardies will be subject to the following rules:
> **1st Offense - 4th Offense:** one (1) day detention after school.
> **5th Offense:** assigned a Saturday School. . . .
>
> Students with persistent problems with tardiness will be reported to the court under the provision of KRS 600.020(24). **Students who fail to comply with these rules may be subject to suspension or expulsion.**[4]

(Doc. # 30-5, p. 1-2) (emphasis in original).  The DCOC also permits some necessary and inherent discretion to school administrators, namely the school principal, to administer the District's overarching policy goals: "Principals and other administrators have the right to: . . . (5) suspend any student whose conduct disrupts the educational process, [and] (6) administer the school environment to provide the proper learning atmosphere."  *Id.*

On the other hand, individual schools within the district are mandated to construct their own disciplinary handbook in accordance with the DCOC.  In designing a school's handbook, the DCOC acts as a ceiling of sorts, where schools may be less stringent or provide modifications on certain rules, but schools cannot go above the regulations and penalties provided by the District School Board through their District Code of Conduct.  In that respect, WES's Student Handbook (the "Handbook"), which largely traces the language of the DCOC and is passed by WES's Site-Based Decision Making Council ("SBDM Council"), appears to comply with the DCOC on policies pertaining to tardiness. However, one particular omission in the Handbook, namely that detention is not listed as a possible sanction for tardiness, now represents the crux of the present controversy.

---

[4] Notably, this section of the district code of conduct does not cite to KRS § 158.150(8), which indirectly contradicts the code as to suspension for attendance matters, stating: "Suspension of primary school students shall be considered only in exceptional cases where there are safety issues for the child or others."  However, this is only a partial conflict because the code applied to both primary and secondary students, whereas the statute applies to primary students only.

Unlike the DCOC, the Handbook only mentions suspension or expulsion, rather than also including the lesser punishment of detention:

> Tardiness will not be tolerated in the Williamstown School. This school is dedicated to teaching and modeling a strong work ethic. Being on time is essential when students make the transition from school to the world of work. Tardiness is also disruptive to the routine of the school. . . .
> Tardiness will be "excused" only in emergency or extraordinary circumstances. . . .
> Students who fail to comply with these rules may be subject to suspension or expulsion.

(Doc. # 30-6, p. 1). It is not clear whether the absence of a specific reference to detention in the Handbook as a possible disciplinary measure to deal with tardiness was a conscious choice by WES's SBDM Council not to utilize detention. This interpretation seems unlikely given the explicit mention of the DCOC-approved, yet statutorily impermissible, measure of "suspension or expulsion," which is unquestionably more severe than the detention alternative. Nevertheless, the Handbook still *technically* failed to provide notice to parents and students that detention may result from an "unexcused" tardy.[5]

The events primarily leading to the commencement of the instant action began in December of 2004. Following an unexcused absence on December 7, the Flege children were assigned detention in accordance with established policy. As evidenced by their continued dissension over the course of several school years, the Fleges' were well aware of the detention policy for unexcused tardies at WES when they proceeded to drop off their children late on December 7, 2004. In line with past practice, Mr. Poer offered the Fleges the opportunity to serve detention in place of their children, recognizing that the

---

[5] However, even though an individual school, such as WES, is ordinarily run and students are governed according to the school's Handbook, Mr. Poer indicates in his deposition that parents do receive a copy of both the Handbook and the District Code of Conduct.

responsibility for the children's tardiness fell on the parents under the circumstances.[6]
Despite the Fleges renewed objection to the tardy policy, Mr. Flege proceeded to serve
detention on behalf of his children.

Having previously and unsuccessfully approached Mr. Poer on numerous occasions
about the tardy policy to no avail, the Fleges turned to Supt. Wilson to voice their
complaints. Supt. Wilson became superintendent of the Williamstown Independent School
District in 2003. In particular, the Fleges' informed Supt. Wilson that they objected to the
rule at WES that required a student to serve detention after incurring an unexcused tardy.
Later in the school year, they also objected to requiring students to serve in-school
suspension for, among other reasons, failing to serve an assigned detention because of
the policy's conflict with KRS § 158.150(8). Supt. Wilson proceeded to investigate the
Fleges' complaints, which they had memorialized in writing, but ultimately supported the
detention policy and deferred to Mr. Poer on the decision to issue an unexcused tardy.

Following a few months without incident, Mrs. Flege, in late April of 2005, ran for a
seat on the school's SBDM Council in an effort to, in part, alter WES's tardy policy.[7] The
election was held on April 26, 2005, but Mrs. Flege did not win election to the Council.[8]

---

[6] Mr. Flege previously served a detention during the 2001-2002 school year when the
Fleges' oldest child had received an unexcused tardy.

[7] Pursuant to KRS § 160.345, site-based councils have the authority to adopt policies, as
long as they are consistent with school district polices.

[8] During her deposition, Mrs. Flege expressed concerns of perceived irregularities in the
voting for the SBDM Council seats. Among these concerns were the method and timing of
providing information about each candidate's reasons for seeking a Council position (i.e., campaign
letters) and the conduct of the election at the meeting. Although slight departures from the normal
course of previous elections may have occurred, there is nothing in the record suggesting that the
Fleges' dispute with the school played any role in the procedures utilized or that the election
procedures in any way negatively and disproportionately affected Mrs. Flege in her election bid.

Shortly thereafter, on May 4, the Flege children were tardy for school, which was their first unexcused tardy since December of 2004 (the Flege children received an excused tardy on April 11).  When Mrs. Flege dropped her children off late, she initially refused to give a reason for their late arrival.[9]  In her deposition, Mrs. Flege explains that she refused to provide a reason because the tardy slips had already been marked unexcused, which, according to Mrs. Flege, was the result of Mr. Poer telling the staff to automatically mark the Flege children as unexcused if they were tardy again.

Consequently, as a result of the tardies being designated as "unexcused," the Flege children were assigned to detention that was to be served on May 11, 2005.  In response to the detention assignment, and due to the Fleges' past failures to alter the tardy policy via Mr. Poer, Supt. Wilson, or the SBDM Council, Mrs. Flege filed a complaint with Kentucky's Office of Educational Accountability ("OEA") regarding the WES tardy policy. Mrs. Flege challenged both the issuance of detention because it was not listed in the Handbook as a possible sanction for a tardy and the possibility of suspension for failure to serve a detention because KRS § 158.150(8) limits such measures to matters of child safety for primary school students.  The OEA, which is only an investigative arm rather than an enforcement body, opened an investigation into the Fleges' complaints that included research of relevant Kentucky school law as well as interviews of all parties concerned.

On May 5, 2005, the day after the unexcused tardy, Mrs. Flege contacted several media outlets in the Cincinnati area to go public with the escalating controversy.  In response to Mrs. Flege's calls, two Cincinnati television stations contacted school officials about the District's tardy policies and Mr. Poer, as well as Supt. Wilson, granted interviews.

---

[9] Mrs. Flege claims, in her deposition, that she eventually communicated to the staff member that traffic was the reason for the late arrival, even though this was never written on the tardy slips for that day.

Mr. and Mrs. Flege were also interviewed by the stations. The stories, which ran on the nightly news that evening, featured on-air interviews with the Fleges and WES staff, and also included a reporter that appeared on the telecast wearing a dunce cap in apparent mockery of the school's policies. Although the Flege children were not interviewed by the stations, they did appear on camera running in the yard of the Fleges' home. Overall, school officials were concerned that the news stories presented a negative image of WES, its administration, and the policies they enforced.

The following day, May 6, 2005, WES held its annual Field Day celebration where students participate in a variety of outdoor activities and parents are invited to attend. Upon watching the television news reports the previous evening, several teachers and members of the elementary school staff decided to show support for Mr. Poer at the Field Day activities. They purchased t-shirts and designed, printed and distributed shirts that stated: "We Support our Policies and our Principal" (Doc. # 30-11). The t-shirts were not paid for with school funds and Mr. Poer was not aware of the organized support effort. Although Mr. Poer did witness the teachers and staff wearing the shirts during Field Day, he did not direct anyone to remove the shirts while at school.

After arriving at Field Day, Mr. Flege approached a staff member who was wearing one of the t-shirts. Mr. Flege questioned the teacher's support of the policy and Mr. Poer. Another teacher, also wearing the shirt, overheard Mr. Flege's comments and confronted him, explaining that he should leave the staff alone so they can carry out their responsibilities, namely supervising the children during the activities. Anticipating her husband's likely rebuttal, Mrs. Flege told Mr. Flege that they should leave. However, prior

to leaving the school grounds, the Fleges walked through the school building.  It is at this point that another "confrontation" occurred.

As the Fleges were walking down one of the school hallways, they encountered a teacher wearing one of the shirts, Misty Middleton ("Ms. Middleton"), who had just ushered some students into her classroom and was in the process of propping the classroom door open.  Although what happened next is at least partially in dispute, as the Fleges, Ms. Middleton, and Mr. Poer (his recollection from being told by Ms. Middleton that same day) have slightly varying interpretations, Ms. Middleton recalled the events in a written statement summarizing the encounter:

> As I was bringing my students in from the gym I was being followed by Mr. and Mrs. Flege, who have a child in my classroom.  As I got my class in the room and went to prop open my door, Mr. Flege turned toward me as he was walking up the hallway and began to yell that (in the closest words possible): "You are a teacher.  You need to be a leader not a follower.  You are suppose [sic] to be an example.  You are an educator.  He then turned and went around the corner.  I said nothing and went back into my classroom to do my best to conduct class.

(Doc. 13-2).  When asked in her deposition whether or not she felt threatened, Ms. Middleton explained that even though she was not directly threatened by Mr. Flege, she nevertheless felt threatened under the circumstances:

> Q:  Did he threaten you in any way?
> A:  No.
> Q:  Did you feel threatened in any way?
> A:  Yes.
> Q:  And how did he make you feel threatened 20 feet away?
> A:  It was just the loud voice and just knowing what had been happening with the issues.
> Q:  So it wasn't what Mr. Flege said or did, other than the decibel level of his voice, but it was the surrounding circumstances that caused you to feel threatened; is that a fair statement?

A:     Well, I would say any time that a parent raises their voice, I feel threatened.  Any time anybody would raise their voice - - and knowing the circumstances, yes.

(Doc. #13, pp. 43-45).

Following the confrontation, Ms. Middleton reported the incident to Mr. Poer who, in response to Ms. Middleton's and other staff member's reports, decided that he would take action to ban Mr. Flege from the school grounds.[10]  After consulting with Supt. Wilson on the matter, Mr. Poer requested a brief meeting with Mr. Flege in his office to explain the situation.  Mr. Flege asked two other District Staff members to attend this meeting as a precaution.  At this meeting, Mr. Poer told Mr. Flege that he thought it best that he leave school grounds and not return.  Mr. Flege did not challenge this decision, and left the campus of his own accord.  Subsequently, Mr. Poer contacted the Williamstown Police Department to obtain a formal Trespass Letter of Warning and Notification ("Warning Letter") for service upon Mr. Flege (Doc. # 30-12).  The Warning Letter, which prohibited entrance on to any property owned by the Williamstown School District at any time, was issued by the Williamstown Police and served by Officer Chris Hankins, who indicated to Mr. Flege that violating the Warning Letter could result in criminal charges.

---

[10] The true reason behind Mr. Poer's decision to ban Mr. Flege remains in dispute and said dispute, according to Plaintiffs, goes to the heart of their First Amendment claims.  Mr. Poer reiterates in his deposition that he only made the decision to seek the Warning Letter once the various reports, namely the encounter with Ms. Middleton, were communicated to him:

Q:     And why were you asking [Mr. Flege] to leave campus?
A:     Because he had confronted three or four staff members, and on the last one it was escalating to a point that I felt like our staff and students were unsafe.

(Doc. # 14, pp. 177-78).  However, Plaintiffs contend that the timeline of Mr. Poer's account of the day's events does not allow for such a conclusion.  Consequently, Plaintiffs assert that the decision to ban Mr. Flege was not because of any specific incidents but was instead an attempt to quell Mr. Flege's dissension generally.

-10-

The following week, WES held its annual Honors Night at the school on the evening of May 10, 2005.  The Flege children were scheduled to receive several honors and Mrs. Flege attended the ceremony without her husband because of the Warning Letter.  While at the ceremony, Mrs. Flege wore a t-shirt protesting the tardy policy and Mr. Poer (Doc. # 30-13).  The message on the front of the shirt stated: "My husband would be here, but he had an opinion."  The back of Mrs. Flege's t-shirt stated: "Poˆer Play? or Policy?" with a "w" inserted over the "^" symbol.  No one from the school's administration or staff confronted Mrs. Flege about her t-shirt or its message.

The next day at school, May 11, the Flege children were scheduled to serve detention for their unexcused tardy on May 4.  In response to the initial assignment of detention, the Fleges had contacted Mr. Poer and informed him that they would not allow their children to serve a detention (nor would they serve the detention in their children's stead) because of their disagreement with the policy.  Mr. Poer, by letter dated May 9, 2005, explained to the Fleges that the children would be required to serve detention on May 11, and if they failed to do so, they would be placed in the ABC room for "in-school suspension" on May 13 (Doc. # 30-17).

When the three Flege children arrived at school on May 11, they were wearing t-shirts with messages pertaining to the ongoing controversy.  The messages on the three shirts read as follows:

1. "Daddy didn't see me stand up at Honors Night" (front); "But he taught me there is honor in standing up for what is right" (back).

2. "Be a leader not a follower" (front); "Read the policy for yourself" (back).

3. "We support fair not flakey policies" (front); (the back of the shirt contained a full quote from KRS § 158.150(8)).

(Doc. # 30-14).  The children were never confronted by school staff about their attire.

That same day, in response to Mr. Poer's earlier letter informing the Fleges that the May 11 detention was still in effect and that failure to serve said detention would result in assignment to the ABC room, Mrs. Flege once again went to the school to speak with Mr. Poer.  Mrs. Flege subsequently informed Mr. Poer that the OEA was looking into the matter of the tardy policy and she requested that the detention be postponed pending the OEA's ruling.  According to Plaintiffs, Mr. Poer reacted angrily and explained to Mrs. Flege that she was causing a lot of problems.  Mr. Poer then informed Mrs. Flege that he had decided against rescheduling the detention that was assigned for later that day and he asked her to leave his office.

Upon leaving Mr. Poer's office, Mrs. Flege engaged Mr. Poer's secretary in a discussion about the classification of her children's tardies as unexcused.  Mrs. Flege claims that she witnessed the secretary give another mother's child an excused tardy for traffic-related reasons, which is the same reason she gave for a prior tardy that was marked unexcused.  This discussion occurred in the main office area, as well as in Mr. Poer's office. Mr. Poer explained to Mrs. Flege that she had no right to inquire about the other children's circumstances and he again told her to leave the office.  After Mrs. Flege exited the office, Mr. Poer made the decision to ban Mrs. Flege from school grounds.  Mr. Poer explained that he based the decision on that day's incident and past incidents, including a report that Mrs. Flege casually approached another teacher, Ms. Whaley, about the ongoing controversy earlier that same morning while waiting to speak with Mr. Poer.

-12-

Later that day, Mrs. Flege was served with a Warning Letter identical to that served upon Mr. Flege the week prior (Doc. # 30-16).  The Fleges refused to allow their children to attend their scheduled detention for that afternoon.  As a result, Mr. Poer notified the Fleges that the children would be required to serve an in-school suspension in the ABC room on May 13, 2005, or the next day the children actually attended school thereafter.

On May 12, the Grant County News, a weekly publication, published a story about the ongoing controversy (Doc. # 30-15).  Both Mr. & Mrs. Flege were interviewed and identified themselves, as well as their children, in the article.  Supt. Wilson and Mr. Poer also gave interviews for the article, which was entitled: "Parental Punishment? Late for School = Detention."  The article focused on the elementary school's tardy policy and the sanctions imposed by the school.  In the article, Mr. Poer classified the tardiness as habitual behavior on the Fleges' part.  Mr. Flege explained that even though the Fleges lived so close, they drove their children to school rather than riding the bus because they were first to be picked up and would get into discipline problems on the long bus rides.[11]

The Flege children did not attend school on May 13, 2005.  When the children did return to school on May 16, the Fleges informed Mr. Poer via letter that he did not have their permission to place the children in the ABC room (Doc. # 30-18).  In addition, and against school policy, Mrs. Flege provided her daughter with a cell phone so that she could call home to report if the children were sent to the ABC room.  Upon their arrival, the Flege children were assigned to the ABC room because of their skipped detention. The Fleges'

---

[11] Mr. Poer also indicated in his deposition that when the children would stay after school late as a result of the Fleges not picking the children up, the two boys would often get into fights with one another.

daughter asked to go to the restroom so she could secretly call her mother to inform her that they had been placed in suspension.  Mrs. Flege immediately came to the school, with a police escort because of the trespass Warning Letter, and withdrew the children from school indicating that they would be home-schooled.  This occurred only two weeks before the end of the school year.

Even after the Flege children were withdrawn from school, the controversy between the Fleges and the District continued in letters to the editor published in the *Grant County News*.  On June 19, 2006, the *Grant County News* published an opinion letter written by Mr. Poer, entitled "Clarification on Williamstown's Attendance Policy," which addressed the attendance policies for the District (Doc. # 30-20).  Although the Fleges were not identified by name in the article, the article did focus largely on the dispute with the unnamed Fleges, at one point calling them "irresponsible" parents.  While the article was written from the point of view of Mr. Poer and the School District, the Fleges also submitted an opinion letter providing their point of view that was published and entitled: "School doesn't have policy for tardiness, says Williamstown parents" (Doc. # 30-19, p. 1).  In addition to the letters of Mr. Poer and the Fleges, an opinion letter was also published from an anonymous parent of two children attending WES who took the side of the school and Mr. Poer; the story was entitled: "Teach children that rules are to be followed" (Doc. # 30-19, p. 2).

In July of 2005, after the end of the school year, the bans against both Mr. and Mrs. Flege entering school grounds were lifted.  During the following school year, on January 27, 2006, the OEA issued its findings on the complaint filed by the Fleges (Doc. # 33-16).  The OEA report found that detention should not have been utilized without explicit mention in the Student Handbook and that suspension was not a proper sanction because of the

mandate in KRS § 158.150(8).  The written policies at WES have since been amended to give notice that detention will be assigned for any unexcused tardies.  Suspension or expulsion have also been omitted as possible attendance-related sanctions.

The Fleges continued to home-school their children through the 2005–06 school year, and into the 2006-2007 year, before enrolling them into the Walton-Verona school district.

### III.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial. *See id.* at 324.  A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).  If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

### B.    Federal § 1983 Claims

Plaintiffs allege an assortment of claims under 42 U.S.C. § 1983, which primarily address an alleged violation of the Plaintiffs' First Amendment rights stemming from the banning of the Fleges from school grounds.   Courts are authorized under § 1983 to "redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law."   *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) (quoting 42 U.S.C. § 1983).   This provision "creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere."   *Flint v. Kentucky Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). To that effect, "to establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove the following two elements: (1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by federal law."   *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).

### 1.      Denial of First Amendment Right to Free Speech

Count One of Plaintiffs' Complaint alleges that Defendants violated the Fleges' First Amendment right to free speech by banning the Fleges from school property.   There can be no question that the Fleges exercised their First Amendment rights to their utmost as the controversy in this case progressed.   The record is unfortunately silent as to, and Plaintiffs have a difficult time articulating, the actual harm suffered by the Fleges (i.e., when were the Fleges actually prevented from speaking).   Although Plaintiffs did indicate at oral argument that the SBDM Council meetings were held regularly and that the scope of the ban excluded the Fleges, Plaintiffs primarily rely on a theory of lost opportunity rather than specific incidents of prevented speech.   In other words, Plaintiffs contend that the banning

-16-

precluded them from entering any school property to continue their dialogue against WES's attendance policies.

Despite the confusion surrounding an assessment of the alleged harm befallen the Fleges, when viewing the facts in a light most favorable to Plaintiffs under a First Amendment forum analysis, the record at this stage is not appropriate for summary adjudication.  Defendants suggest that the school property constitutes a nonpublic forum, citing for support the Supreme Court's decision in *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*: "Even protected speech is not equally permissible in all places and at all times.  Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." 473 U.S. 788, 799-800 (1985).  This statement is quite unremarkable, however, as all public forums are of course subject to reasonable time, place, and manner restrictions as a function of maintaining order, so long as those restrictions serve a compelling state interest where content-based.   *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).

Whether or not Defendants are making such an argument, the banning of the Fleges in this case simply does not lend itself to a strict nonpublic forum analysis because the broad scope of the ban – excluding the Fleges from all school property at all hours for an indefinite period of time – creates various scenarios where the school property might shift its forum capacity.  In other words, during school hours, the school grounds would likely constitute a nonpublic forum as to outsiders, such as parents.  However, during after-school and adult activities, namely SBDM Council meetings, the property would act as a

limited public forum.  *See Madison Joint School Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175-76 (1976).  As a limited public forum, a ban preventing the Fleges from council meetings, especially when the catalyst for the bans was a disruption of the *educational process*, would have to be reasonable and viewpoint neutral.  *See Perry*, 460 U.S. at 45-46.  A genuine issue of material fact exists as to whether the scope of the ban was reasonable, in light of the precipitating events, as well as whether the ban was viewpoint neutral, which goes to the heart of Plaintiffs' retaliation claim found in Count Two of Plaintiffs' Complaint.

Regardless of the forum classification, there remains a material factual dispute surrounding the motive for Mr. Poer's banning of the Fleges.  It is for the jury to determine whether the ban was reasonable, viewpoint neutral, or even effectuated solely for suppression of speech when in the nonpublic fora context.  Accordingly, summary judgment on Count One is denied.

### 2.    Retaliation for Exercise of First Amendment Rights

In Count Two, Plaintiffs allege that Defendants retaliated against the Fleges because of their continued criticism of Mr. Poer and WES's policies, which is a valid exercise of the Fleges' First Amendment rights.  The elements of a retaliation claim are well-established and require Plaintiffs to establish the following elements: "(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights."  *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

-18-

As to the first element, despite Defendants' tepid contention otherwise, there can be no question as a matter of law that the relevant conduct on the part of the Fleges falls squarely within the realm of First Amendment speech protected by the Constitution.  *See Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964)) ("The right of an American citizen to criticize public officials and policies and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.'").

Skipping to the third element, which looks at the intent of the state actor, Defendants implicitly acknowledged at oral argument, and appropriately so, that this question is exclusively within the province of the jury.  The standard requires only that the adverse action (i.e., the banning) was motivated "at least in part" by Plaintiffs' constitutional exercise of their free speech rights.  Even though there is no direct evidence as to Mr. Poer's state of mind, the circumstances surrounding the bans and Plaintiffs' dispute over the timeline involved constitutes the crux of Plaintiffs' entire action.  The inquiry of whether Mr. Poer's decision to ban the Fleges and the ban's scope were based on legitimate reasons, such as disruption of the educational process, or were effectuated to quell the Fleges' criticism is certainly a genuine issue of material fact that survives summary judgment.  *See Bloch*, 156 F.3d at 682 (recognizing, in a retaliation claim context, "that claims involving proof of a defendant's intent seldom lend themselves to summary disposition.").

Finally, Defendants place the greatest impetus on the second element of the retaliation framework, which requires that the banning caused Plaintiffs to "suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity."  *Id.* at 678.  Defendants argue that Plaintiffs have failed to point to a single activity,

other than speaking to Mr. Poer during school hours, that they were prevented from engaging in and that they continued to speak out through alternative channels. Defendants assert that this fails the second prong because Plaintiffs have failed to demonstrate an actual injury and the record demonstrates that the Fleges were not chilled by the ban, as they continued to exercise their First Amendment rights by way of contacting the press, wearing t-shirts in protest (including the children), and even withdrawing their children from school.

However, Defendants misinterpret the purpose and reach of the "adverse action" prong. First, while Plaintiffs would eventually be required to prove, at trial, an actual injury, this "injury" requirement does not refer to the Fleges' actual inability to exercise their First Amendment rights, as this harm would never be directly compensable without some form of manifestation (i.e., humiliation, emotional distress, impairment of reputation). *See Bloch*, 156 F.3d at 678-79 (citing *Memphis Community School Dist. V. Stachura*, 477 U.S. 299, 307 (1986)) (discussing the issue of compensable injuries in a retaliation context under the second prong). In other words, proof of injury for the purpose of damages in § 1983 actions is entirely separate from the question of whether Plaintiffs were subjectively harmed as a result of the banning, which renders moot the question of whether the Fleges continued to exercise their rights.

Second, simply because Plaintiffs continued to exercise their rights through alternative channels, regardless of whether the bans' effects were material to the Fleges' efforts, does not indicate that the action taken by Defendants fails to satisfy a retaliation claim as a matter of law. *See Bloch*, 156 F.3d at 678-81 (discussing the objective nature of the inquiry under prong two of the retaliation framework). Plaintiffs must show only, as

an objective inquiry, that a person of reasonable firmness would be deterred from continuing to engage in their protected activity.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 396-99 (6th Cir. 1999) ("The benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial of actions from constitutional cognizance. We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.").

Simply put, the injury element of prong two requires that Plaintiffs actually suffered a compensable harm while the "chill" element is an objective standard, appropriately left for the jury, the purpose of which is to probe the materiality and reasonableness of Plaintiffs' claim.  *Thaddeus-X*, 175 F.3d at 398 ("The determination of whether the [adverse action] was sufficient to state a retaliation claim under § 1983 [is] a question of fact, not dismissible as a matter of law.").  Accordingly, because there are genuine issues of material fact upon which a reasonable jury could find for the Fleges, Plaintiffs' retaliation claim in Count Two survives summary judgment.

### 3.    Unlawful Detention and Confinement

Plaintiffs allege in Count Three that Defendants unlawfully and maliciously detained and confined the Flege children on May 16, 2005 when Mr. Poer assigned the children to the ABC room for in-school suspension as a result of their failure to serve the assigned detention on May 11.  Although failing to cite any law in support of their claims made in Count Three, Plaintiffs nevertheless assert that Defendants' conduct translates to a deprivation of the children's liberty interest without due process of law and also constitutes an equal protection violation.

First, Plaintiffs' argument that placement of the Flege children in the ABC room constitutes unlawful confinement by way of an equal protection violation cannot be sustained.  Plaintiffs assert that the equal protection violation occurred when the Flege children received an unexcused tardy on May 4, 2005.  According to Plaintiffs, Mr. Poer informed his secretary that if the Fleges were late again to automatically consider the tardy as unexcused, regardless of the reason provided for the tardiness.  Plaintiffs also claim that other students were receiving excused tardies for traffic-related reasons when the same excuse was considered insufficient for the Flege children.  Even crediting Plaintiffs' version of the facts as true, Defendants prevail as a matter of law.

Plaintiffs were well aware of the tardy policies at this stage of the controversy, having received several tardies in the past, both excused and unexcused.  Early during the same 2004-2005 school year, the Flege children received an unexcused tardy when traffic was provided as an excuse.  Whether or not other children were receiving excused tardies for traffic-related reasons, evidence of which is entirely absent from the record aside from Mrs. Flege's testimony of what she believed she saw and heard, Plaintiffs cannot dispute that

-22-

school administrators possess a necessary degree of discretion to determine disciplinary issues on a case-by-case basis. If one student is never late and another is late four or five times a year, regardless of past reasons, it is well within an administrator's discretion to treat those two students disparately, especially where the administrator views a student's behavior as habitual and/or believes a level of dishonesty is involved.

Second, Plaintiffs' alternative ground for establishing their claim of unlawful confinement rests on a claim of deprivation of the Flege children's liberty interest without due process. This claim similarly fails because the Fleges made the conscious choice to have their children skip detention. Regardless of whether Mr. Poer had the parents' permission to assign the children to the ABC room, which he clearly did not in this case, a school administrator has the authority to take disciplinary action under such circumstances to insure that children, or their parents, follow rules so as to maintain an environment conducive to learning. When the Fleges sent their children to school on May 16, 2005, they had received explicit notice that the children would be placed within in-school suspension for their failure to serve the earlier detention. The detention for the unexcused tardy on May 4 may not have been explicitly authorized by the Student Handbook, as both parties acknowledge, but it is preposterous to conclude that Mr. Poer's assignment of detention for an unexcused tardy constitutes unlawful conduct rising to the level of a constitutional violation.

Furthermore, any argument that the Flege children possessed a constitutionally protected liberty interest in being placed in one classroom over another is untenable at best. During school hours, the Flege children were in the custody of the school. The school's decision to place the children in an alternative behavior room could not be

"unlawful" rising to the level of a constitutional violation because the children were already "confined" by the school when left in their custody.  Where the children are placed within the school during the school day, while in the school's custody, in no way implicates a liberty interest.  Without parental intervention, the Flege children were never more "free" to leave their regular classroom than they were to leave the ABC room.

Although the Fleges were told that a missed detention would lead to in-school suspension, they nevertheless made the decision for their children to skip the detention. They were also on explicit notice that their children would be placed in the ABC room on May 16, 2005 and they made the decision to bring their children to school only to withdrawal them later.  They also had sufficient opportunity to challenge Mr. Poer's decision, an opportunity that was seized to no avail.  Accordingly, Plaintiffs' claims for unlawful detention and confinement fail as a matter of law on both grounds, as no reasonable jury could find that a constitutional violation took place.[12]  Count Three of Plaintiffs' Complaint is therefore dismissed.

### 4.   Conspiracy

In Count Four, Plaintiffs allege that Defendants were part of a civil conspiracy to violate the constitutional rights of the Fleges in violation of 42 U.S.C. § 1983.  Although the vague allegations in the Complaint allege multiple acts toward the greater conspiracy,

---

[12] Although the Court does not reach a full-scale analysis of qualified immunity, it is noted that Defendants do assert that they are immune.  "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Estate of Carter v. Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A constitutionally protected liberty interest in not being placed in an alternative classroom during school hours, if such an interest were to somehow exist, could never be said to be clearly established.  Thus, Defendants' qualified immunity argument on this Count is well-founded.

Plaintiffs narrow the scope of their conspiracy claim in their Response to Defendants' Motion, focusing solely on the ban of the Fleges from school grounds:

> Plaintiffs have adduced proof that there was a single plan that all Defendants shared (i.e., banning Mr. and Mrs. Flege from all school district property in order to quiet their challenge to school policies and practices), and there was an overt act in furtherance of this plan (i.e., Mr. and Mrs. Flege were banished from all school district property).

(Doc. # 33, p. 28).  Defendants assert that none of the allegations made by Plaintiffs, or anything in the record more generally, in any way evince a conspiratorial design.  The Court agrees.

The standard for a civil conspiracy claim, pursuant to § 1983, was originally set forth by the Sixth Circuit in *Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985):

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful actions.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have know all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an over act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Id.* at 943-44.  It is also well-settled that civil conspiracy claims "must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

As Plaintiffs acknowledge, "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy."  *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984)).

Nevertheless, the record in this case is devoid of *any* proof that Supt. Wilson conspired –
as opposed to simply discussing – with Mr. Poer to ban the Fleges from WES in an attempt
to quell their indignation.  A review of the record and Plaintiffs' allegations, viewed in a light
most favorable to Plaintiffs, reveals that only a single conversation took place between Mr.
Poer and Supt. Wilson in regards to the banning.  During the phone call in question, which
occurred the same morning of the precipitating events and the eventual ban, Mr. Poer
explained the situation and asked Supt. Wilson if he approved of Mr. Poer's decision to ban
the Fleges.  Simply put, the mere approval of a discretionary action by an authority figure
does not constitute the existence of a conspiracy.

In the end, the record must contain some evidence that there was a "single plan,"
or conspiratorial objective, that the Defendants conspired to bring about.  Although
circumstantial evidence may prove enough in certain cases, Plaintiffs do not cite to such
proof here.  Instead, Plaintiffs simply suggest that they have adduced proof through
deposition testimony that Mr. Poer and Supt. Wilson conspired to ban the Fleges from
school grounds.  Not only have Plaintiffs failed to plead their conspiracy claim with a
sufficient degree of specificity, but the alleged facts as recited by Plaintiffs still fail to state
a cause of action for civil conspiracy.  The bottom line is that a *plan* was not present in this
case; consulting with a superior to gain approval for a discretionary action, and the superior
acquiescing in the action, or even granting direct approval for the action, does not translate
to a conspiracy.

Accordingly, Plaintiffs' conspiracy claim fails as a matter of law because the
allegations, even taken as true, do not state a cognizable cause of action for conspiracy.
Count Four of Plaintiffs' Complaint is therefore dismissed.

**5.      Denial of Due Process**

As evident from the preceding analyses, the circumstances of this case present a very unique scenario for many of Plaintiffs' claim, which makes analysis under traditional legal standards somewhat akin to forcing a square peg through a round hole.  Such an analogy perhaps holds the most true in the context of Plaintiffs' due process claim.  To make matters even more difficult, Plaintiffs have failed to identify under what theory or theories of due process their claim is founded upon, referring to the claim as a "mixed bag" at oral argument.

Generally speaking, Plaintiffs assert that Defendants, acting under color of a local custom or practice, violated the Fleges' constitutional right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution, which provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV.  The due process clause has been held to apply to both substantive and procedural matters.  *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).  However, because Plaintiffs have not identified whether their claim is procedural and substantive, and because there is not an analytical framework in place for "mixed bag" claims, the Court gives Plaintiffs the benefit of the doubt that both theories are in play.

To maintain an action under § 1983 for a violation of procedural due process, Plaintiffs must show that: (1) their interest at stake is a protected right under the Fourteenth Amendment, (2) the deprivation of the interest contravened notions of due process, and (3) state or administrative processes and remedies to redress the alleged violation are inadequate.  *See Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 587-88 (6th

Cir. 2004); *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002).  Although the analysis lends itself to a three-pronged approach, Plaintiffs' claim fails on its face because the Fleges never pursued any post-deprivation procedures and Plaintiffs fail to set forth that any procedures which may have existed were inadequate.[13]

Assuming *arguendo* that Defendants' actions in banning the Fleges from school property indeed violated a constitutionally protected right and did so without providing due process, Plaintiffs must still prove that state processes for redress are inadequate.  *See Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir. 1983), cert denied*, 469 U.S. 834 (1984) ("In a procedural due process case under section 1983, the plaintiff must attack the state's corrective procedure as well as the substantive wrong."); *Jefferson*, 360 F.3d at 588 ("Plaintiff may not seek relief under *Section 1983* without first pleading and proving the inadequacy of *state or administrative processes or remedies* to redress her due process violations.") (second emphasis added).     Specifically, to maintain an action under 42 U.S.C. § 1983 based on a violation of procedural due process, Plaintiffs must show that: "(1) the state does not provide any remedy; (2) the state provides a remedy, but it is inadequate; or (3) the state provides an adequate remedy in form, both procedurally and in damages, but the state failed to apply or misapplied the remedy." *Gardner v. Village of Grand River*,

---

[13] Although procedural due process generally requires notice and an opportunity to be heard pre-deprivation, *see Fuentes v. Shevin*, 407 U.S. 67, 82 (1972), adequate post-deprivation procedures may satisfy due process requirements "where a State must act quickly, or where it would be impractical to provide pre-deprivation process."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  Unlike the more common deprivations of property, where a pre-deprivation procedures may be possible, the circumstances of this case do not lend to such a conclusion, especially given that the banning of an individual is an action that is most often taken with some haste.

-28-

955 F. Supp. 817, 824 (N.D. Ohio 1997) (citing *Haag v. Cuyahoga County*, 619 F. Supp. 262 (1985), aff'd without opinion, 798 F.2d 1414 (6th Cir. 1986)).

This showing does not require Plaintiffs to have utilized or exhausted the processes if they indeed exist, but rather Plaintiffs must show only that there are no such processes in place or that those in place are inadequate. Plaintiffs have failed to make this showing. At oral argument, Plaintiffs conceded that they were contemporaneously aware that an appeal to the Board of Education was the appropriate procedural avenue to air their complaint about being banned from school property. However, Plaintiffs now argue that they did not avail themselves of an appeal to the Board because they were banned from school property – sort of a catch 22. This argument is disingenuous.

If the Fleges have demonstrated anything, they have shown their resolve at probing the various channels of change. Their failure to write a letter to the Board, which is how all appeals would intuitively commence, was not prevented by their banning and simply evinces a decision by the Fleges not to go to the Board, most likely because the point was moot once they had pulled their children from WES. Claims for procedural due process under the federal Constitution are only available to remedy alleged constitutional deprivations that occurred without providing due process to the deprived party. Accordingly, because the Fleges knew of the available post-deprivation procedure and have failed to make any showing as to its inadequacy, a claim for procedural due process is without merit.

Turning to substantive due process, this right of action has been defined as "the doctrine that governmental deprivations of life, liberty, or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*,

961 F.2d 1211, 1216 (6th Cir. 1992) (internal citations omitted). The threshold for the invocation of substantive due process is incredibly high, as it is intended as a final safeguard against government actions that scream abuse and shock the conscience. To that effect, the protections of substantive due process are limited to government action that is "arbitrarily and oppressively exercised," where "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).

The actions by Defendants in this case, even if found to be unconstitutional by a jury, do not approach the necessary level of grievousness to offend substantive due process and a reasonable jury could not find otherwise. Accordingly, Count Five of Plaintiffs' Complaint is dismissed.

### 6. Refusing/Neglecting to Prevent

Plaintiffs allege in Count Six that Defendants, Supt. Wilson and the Board of Education, refused and/or neglected to prevent the alleged constitutional violations inflicted upon the Fleges by Mr. Poer. At the outset, both parties seem to have difficulty in identifying the true moniker of Plaintiffs' claim. This difficulty was manifested at oral argument where both parties, especially Plaintiffs as owners of the claim, failed to articulate the theory under which Count Six should proceed. On the one hand, Plaintiffs refer to their claim as a failure to prevent, citing Eighth Amendment jurisprudence that, although well-settled, has been applied almost exclusively in a prison context and appears at best marginally relevant to the case *sub judice*. Defendants, on the other hand, construe

Plaintiffs' allegations as a claim for failure to properly train and supervise.[14]  Regardless, the parties seem to at least agree that the ultimate standard applied to the relevant actors for purposes of this claim is "deliberate indifference."

Plaintiffs are frustratingly inconsistent and vague in stating their claims found in Count Six.  Plaintiffs' first couched the claim in their Complaint in terms of both a claim for municipal liability based on an unconstitutional policy or practice as well as a claim for failure to supervise or otherwise prevent.  However, in their briefing on Defendants' Motion, Plaintiffs shift their very cursory analysis to a failure to prevent framework under traditional Eighth Amendment case law.  Even if Plaintiffs' cryptic claims move forward under a theory of supervisory liability based on a failure to prevent, despite the absence of any analogizing authority, Plaintiffs' acknowledge that a showing of deliberate indifference is necessary. *See Farmer v. Brennan*, 511 U.S. 825, 834 (2006).

Specifically, for these category of claims, there is both a subjective and objective component.  *See id.*  The objective element requires that the alleged harm be "sufficiently serious" or that the conditions allegedly facilitated by Supt. Wilson and the Board posed "a substantial risk of serious harm."  *Id.*  Subjectively, Plaintiffs must show that the individual Defendants possessed a "sufficiently culpable state of mind," which in this case translates to a showing of deliberate indifference.  *See id.*  In other words, as Plaintiffs set forth,

---

[14] If Plaintiffs' claims in Count Six were analyzed under a failure to train and supervise framework, the claims would necessarily fail because there is no proof in the record with regard to the training or policies of supervision in this case.  Similarly, Plaintiffs fail to point to any evidence of a custom or practice involving the banning of individuals from Williamstown schools, nor are there any policies in place that specifically deal with the procedures and appropriate reasons for banning from school grounds.  Intuitively, these types of situations are very rare and dealt with on a case by case basis.

Defendants would only be liable if they knew of and deliberately disregarded a substantial risk of harm to the Fleges.

As an initial matter, it is difficult to even cognize a claim of supervisory liability against Supt. Wilson when Plaintiffs assert, and Defendants concede, that Supt. Wilson approved the efforts of Mr. Poer to ban the Fleges. If Supt. Wilson was a direct actor in the alleged unlawful conduct via his explicit and contemporaneous approval, a claim for failure to prevent intimates a sense of redundancy and should likely be subsumed by Plaintiffs' overarching constitutional claims. In other words, Supt. Wilson is named as a defendant in all of Plaintiffs' constitutional claims because he was informed of the ongoing situation and permitted the banning. Therefore, if Plaintiffs prevail, Supt. Wilson would have to be liable alongside Mr. Poer based on either his direct role in the banning or via *respondeat superior*, which is a permissible theory of liability under § 1983 where "the supervisor encouraged the specific incident of misconduct or in some way directly participated in it." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) (quoting *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 727 (6th Cir. 1996)).

Simply put, Plaintiffs effectively confuse the purpose of vicarious liability recovery under § 1983 as it is not intended to invoke a separate claim based on supervisory liability but is instead intended to permit recovery against a participatory supervisor based on the underlying constitutional violation. Accordingly, Plaintiffs' claim against Supt. Wilson for failure to prevent the alleged harm is subsumed by Plaintiffs' First Amendment claims.

As to the Board of Education, even assuming *arguendo* that the claim for failure to prevent is cognizable[15] and that the alleged constitutional harms suffered by the Fleges could be considered "sufficiently serious," which is in itself tenuous given the traditionally physical nature of harm in failure to prevent cases, a reasonable jury could not find that the Board both knew of a substantial risk of harm to the Fleges and subsequently disregarded it with deliberate indifference.  Plaintiffs acknowledge that the Board's only involvement was mere notification, after the fact, that the action occurred – Supt. Wilson wasn't even positive he talked to the Board, but surmised that he probably did in his deposition.  Even assuming that the Board as a governing entity was somehow aware of the situation subsequent to the Fleges' banning, such passive acquiescence does not translate to "deliberate indifference."  This is especially true considering the Board was never asked to intervene by the Fleges, despite Plaintiffs' concession at oral argument that they were aware of appeal procedures.[16]

Furthermore, according to Plaintiffs' recitation of the case law, the Board had to actually know of and subsequently disregard the risk that Plaintiffs were being constitutionally harmed.  *See Farmer*, 511 U.S. at 837.  To that effect, the record is completely devoid of any proof to even suggest that the Board was aware of any potential risk of constitutional violations perpetrated upon the Fleges, let alone acted with deliberate

---

[15] Unlike the claim against Supt. Wilson, Plaintiffs' claim for failure to prevent against the Board would not be subsumed by the underlying constitutional claims because Plaintiffs do not allege direct involvement by the Board.  Instead, Plaintiffs simply assert that the Board was informed after the fact and acquiesced in the alleged unlawful conduct by failing to remedy the ban.

[16] As discussed within the context of Plaintiffs' due process claim, Plaintiffs' argument that they did not pursue an appeal before the Board because they were banned from all Williamstown Schools property is entirely unconvincing, even viewing the facts in Plaintiffs' favor.

indifference in disregarding such risk of harm.  Accordingly, Plaintiffs failure to place at issue the Board's knowledge of the circumstances surrounding the ban and the Board's state of mind in their alleged acquiescence is fatal.  Count Six is therefore dismissed.

## C.   State Law Claims

### 1.   Malicious Prosecution

In Count Seven, Plaintiffs assert that the Trespass Warning Letters served upon Mr. and Mrs. Flege, banning them from all property of the Williamstown School District, constitutes malicious prosecution.  It is not necessary to enter into a full-scale analysis of Plaintiffs' claim because the claim fails as a matter of law on the threshold element.  To state a cause of action for malicious prosecution, Plaintiffs must first demonstrate "the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings."  *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981).  A trespass warning letter does not constitute a judicial proceeding and Plaintiffs fail to cite any authority supporting a conclusion to the contrary.  The warning letters only prohibited the Fleges from entering school grounds and were obtained without judicial intervention.  A claim for malicious prosecution would only have been cognizable if the Fleges actually violated the warning letter and were subsequently arrested for trespassing. In the absence of an actual prosecution, Plaintiffs' claim for malicious prosecution fails. Accordingly, Count Seven of Plaintiffs' Complaint is dismissed.

### 2.   Abuse of Process

Count Eight alleges an abuse of process by Defendants in the securing of the trespass warning letters.  Plaintiffs assert that Defendants did not pursue the Warning

Letters for the stated reasons – i.e., because the Fleges were disrupting the educational process and posing a threat – but rather sought to ban the Fleges from school grounds as both a retaliatory measure for their ubiquitous challenges to the school attendance policies and to prevent them from making future challenges.  Defendants, namely Mr. Poer and Supt. Wilson, maintain that banning the Fleges was necessary because they were disrupting the educational process.

The essential elements of an action for abuse of process are: "(1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding."  *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citing *Bonnie Braes Farms Inc. v. Robinson*, 598 S.W.2d 765 (Ky. Ct. App. 1980)).  "The distinction between an action for malicious prosecution and an action for abuse of process is that a malicious prosecution consists in maliciously causing process to be issued, whereas an abuse of process is the employment of legal process for some other purpose other than that which it was intended by the law to effect."[17]  *Raine v. Drasin*, 621 S.W.2d 895, 902 (Ky. 1981).

Although claims for malicious prosecution and abuse of process are of course distinct in their targeted conduct, Plaintiffs' claims under both theories fail as a matter of law for identical reasons.   At its core, an abuse of process claim must allege "the irregular or wrongful employment of a judicial proceeding."  *Simpson*, 962 S.W.2d at 394.  In the case *sub judice*, however, the legal process was never invoked and there was never any form of judicial proceeding.  *See id.*; *Raine*, 621 S.W.2d at 902.  The securing of a trespass

---

[17] "Moreover, an action for abuse of process will not lie unless there has been an injury to the person or his property.  Injury to name and reputation is not sufficient."  *Raine*, 621 S.W.2d at 902.

warning letter is merely a mechanism to provide verifiable notice to the banned individual as a function of satisfying the trespass statutes, which require that the offender "knowingly" enter on to the *prohibited* premises.  *See* KRS §§ 511.060-080.

In *Bonnie Braes Farms Inc. v. Robinson*, the court determined that a claim for abuse of process failed on its face because the alleged abuse was merely a filing of a *lis pendens* notice, which provides notification to a party that a suit has been filed concerning a claim on their property.  *See* 598 S.W.2d 765, 766 (Ky. Ct. App. 1980).  The *Robinson* court held that the legal process was never invoked, stating: "[The notice] is filed without intervention of the judicial authority and brings neither the property nor any parties before the court. Since there is no process, there can be no abuse of process."  *Id.*  To that effect, the procedures utilized in the current action to secure the Warning Letters did not involve any judicial intervention or court proceedings, and, unlike in *Robinson*, the notice in this case was not even filed with the court system.

Accordingly, because the Warning Letters were secured against the Fleges without invoking the legal process and without judicial authority, Plaintiffs' claim for abuse of process fails as a matter of law and Count Eight of Plaintiffs' Complaint is therefore dismissed.

### 3.    Right to Public Education

Count Nine alleges an infringement upon the Flege family's fundamental right to receive an adequate public education.  *See Rose v. Council for Better Educ.*, 790 S.W.2d 186, 206 (Ky. 1989); *see also* Ky. Const. § 183.  Defendants readily acknowledge this right. However, Defendants remind the Court that the Fleges made the decision to withdraw their children from public school and pursue the home-schooling alternative; the District was

-36-

always willing to accept the students back and remains so.  Plaintiffs concede that the school did not directly cause the withdrawal of the Flege children, but insist that the actions of WES and the District, namely banning the Fleges from school grounds and assigning in-school suspension for their children, gave them no other choice but to remove their children.  Plaintiffs state: "No reasonable person could withstand such treatment and continue to allow their children to attend school under such circumstances."

There is no question that a school can infringe on the right to receive a public education through indirect actions.  In other words, it is not necessary that the school expelled the children or otherwise refused to provide educational services.  It would be sufficient for purposes of stating a cause of action to allege that the actions of the public school system forced the voluntary withdrawal of the Flege children from school.  However, the policies of the District as implemented by Mr. Poer and WES in this case, whether or not explicitly disclosed to parents, do not equate to an infringement of the fundamental right to receive a public education as guaranteed by the Kentucky Constitution.  *See* Ky. Const. § 183.

The relevant actions of Mr. Poer and WES as to the children, namely assigning detention for an unexcused tardy and subsequently assigning in-school suspension for the skipped detention, in no way limited or otherwise materially interfered with the ability of the Flege children "to pursue and achieve [the] important educational 'capacities'" required for an adequate education.  *D.F. v. Codell*, 127 S.W.3d 571, 576 (Ky. 2003).  The Flege children could have taken the free school bus service to avoid any unexcused tardies for which the Fleges knew would result in detention.  The Flege children could have served the after-school detention, which would have never affected their educational pursuits.  Finally,

the Flege children could have remained in the ABC room on May 16, 2005, while continuing to complete their school work.  At several junctures, the Fleges had multiple opportunities to ensure that their children were not deprived, through the parent's own actions, of the ability to receive an adequate education.

Furthermore, while the Court is without the aide of legal authority to define the bounds of this particular claim, Plaintiffs' primary argument that the banning of the Fleges from school grounds constituted an infringement on their children's educational rights does not pass muster.  It may not prove inconceivable for state action taken against parents to infringe on their children's rights, thereby invoking both the rights and standing of their children to contest the alleged violations, but the general allegation that banning parents from school grounds infringes upon a child's right to receive public education is not sufficient to state a cause of action as a matter of law.  The Fleges have not identified any specific and manifest consequence of their banning that directly interfered with their children's ability to receive educational services.

The narrow, albeit fundamental, right to an adequate education under the Kentucky Constitution is defined as providing "each and every student within the Commonwealth the opportunity to learn and develop seven different intellectual, physical, and social capabilities." *Id.* (citing *Rose*, 790 S.W.2d at 212).  A parent's role in a child's education is unquestionably one of great importance, a role often underutilized, but the banning of the Fleges in this case, regardless of whether effectuated justifiably or even lawfully, does not rise to the level of a cognizable constitutional cause of action for infringing upon the Flege children's right to receive an adequate public education.  Accordingly, as a matter of law, Count Nine of Plaintiffs' Complaint is dismissed.

-38-

### 4.     False Light

Plaintiffs' allege in Count Ten that Mr. Poer and Supt. Wilson, acting in concert, invaded Plaintiffs' privacy by placing the Fleges in a false light.  As both parties acknowledge, there are two basic requirements to sustain a "false light" invasion of privacy claim under Kentucky law: "(1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed." *Mineer v. Williams*, 82 F. Supp. 2d 702, 704 (E.D. Ky. 2000) (applying Kentucky law).

The sole basis of Plaintiffs' false light claim is the opinion letter published by Mr. Poer, and approved by Supt. Wilson, in the *Grant County News* in June of 2005.  Although entitled "Clarification on Williamstown's attendance policy," the article discussed WES's policies in the context of the dispute with the Fleges, providing a detailed history of the controversy (Doc. # 33-15).  However, two previous publications, a newspaper article providing both parties' viewpoints and an opinion letter by the Fleges, had already established the ongoing controversy in the public domain, including the names of all parties concerned and details as to the tardiness of the Flege children.

Plaintiffs assert that Mr. Poer's characterization of the Fleges as "irresponsible" parents is the lone statement that places them in a false light.[18]  In this regard, Defendants

---

[18] In their Response, Plaintiffs do not point to any other statement that allegedly places the Fleges in a false light.  However, in their Complaint, as well as indirectly within their Response, Plaintiffs appear to take issue with the disclosure of details surrounding the controversy, even though the article never mentions any of the Fleges by name.  Although disclosure of private matters can potentially rise to the level of invasion of privacy, the details of the dispute had been disclosed by prior news stories, including an opinion letter written by the Fleges.  Regardless, the

completely mischaracterize the case of *Bell v. Courier-Journal*, 402 S.W.2d 84, 87 (Ky. 1966), citing it for the proposition that "truth is a complete defense to false light invasion of privacy claims." Clearly to the contrary, *Bell* reads: "[W]hile truth is a complete defense for libel, *it is not a defense to an action for invasion of the right of privacy*." *Bell*, 402 S.W.2d at 88 (emphasis added).

While the question of whether the "irresponsible" characterization of the Fleges by Mr. Poer would be considered highly offense to a reasonable person may be a question best left to a jury under the circumstances, Plaintiffs' claim cannot satisfy the second element. The publisher, in this case Mr. Poer, could not have possessed "knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [Fleges] were portrayed." *Mineer*, 82 F. Supp. 2d at 704. Even though truth is not necessarily a *complete* defense, the applicable standard dictates that it is a defense insofar as the publisher knows it to be true – i.e., the publisher could not have acted in reckless disregard as to the statement's falsity if he knew it to be true.

In that regard, Mr. Poer's statements did not characterize the Fleges as irresponsible, but rather his statement was: "On numerous occasions and over the past few years, one set of Williamstown Elementary parents have been irresponsible in getting their three children to school on time." Therefore, because the Fleges were indeed late getting

---

tenor of the entire article, aside from the "irresponsible" statements, could not be considered as highly offensive to a reasonable person, and a reasonable jury could not find otherwise.

their children to school on numerous occasions, as Plaintiffs concede, this is by definition an irresponsible act, no matter how slight.[19]

Alternatively, even if the characterization of such actions as irresponsible is not considered a fair one, Mr. Poer cannot be said to have acted with reckless disregard as to the statement's falsity where it was his *opinion* that the actions providing the foundation for the statement (i.e., the multiple tardies), which are undisputed, constituted irresponsible conduct.   This inevitable conclusion, one in which a reasonable jury could not find otherwise, is bolstered by the personal knowledge of Mr. Poer in regard to the history of the controversy, including that: (1) the Flege children were late on numerous occasions over many years; (2) he believed they may have been dishonest on at least one occasion where an electricity outage was provided as an excuse; (3) traffic was given as an excuse a number of times; and (4) the Flege children could have utilized the free school bus service in order to prevent the possibility of arriving to school late.

Accordingly, as to Plaintiffs' claim for invasion of privacy, Defendants prevail as a matter of law and Count Ten of Plaintiffs' Complaint is therefore dismissed.

### 5.    Outrageous Conduct

In Count Eleven, Plaintiffs assert a claim for outrageous conduct.  Because Plaintiffs do not identify what acts on the part of Defendant constitute outrageous conduct, it is

---

[19] In other words, if a parent's dropping off of their children at school on time is considered responsible, then the opposite of said action, i.e., dropping the children off late, is necessarily considered as irresponsible.  It is true that the "irresponsible" characterization may be removed when the action is justified or "excused," such as in an emergency, but Mr. Poer's opinion that the Fleges' actions were irresponsible because traffic was often provided as the excuse does not constitute reckless disregard for the falsity of his statements, especially given his knowledge that the Fleges at all times had the opportunity to place their children on a school bus.

difficult to assess the scope of Plaintiffs' claim.  Nevertheless, as laid out by Plaintiffs, a claim for outrageous conduct consists of "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ."  *Craft v. Rice*, 671 S.W.2d 247, 251 (Ky. 1984).  The definition of extreme or outrageous conduct is conduct that constitutes a "deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community."  *Id.* at 250.

Although Plaintiffs fail to specifically identify what conduct is allegedly outrageous, it is nevertheless for this Court to determine whether Defendants' conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery."  *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2001) (citing Restatement (Second) of Torts § 46) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.  Where reasonable men may differ, it is for the jury . . . to determine whether . . . the conduct as been sufficiently extreme and outrageous to result in liability.").  In looking at the individual acts by Defendants and viewing the facts in a light most favorable to Plaintiffs, the relevant conduct of Defendants, save the possible retaliation discussed *infra*, does not even approach the boundaries of outrage.

Plaintiffs argue that Mr. Poer and Supt. Wilson did not even possess the authority to secure a Trespass Warning Letter because control of school property is vested solely with the Board of Education by virtue of KRS § 160.290  But Plaintiffs cannot seriously contend that school administrators, especially principals and superintendents, do not have the discretionary authority to ban individuals from a school campus, at the very least for

short-term scenarios.  School administrators are necessarily vested with such authority in order to maintain a safe and conducive learning environment.  To that effect, there can be no question that such authority was inherently vested with Supt. Wilson, who subsequently delegated to Mr. Poer in this instance with his explicit approval.  *See* KRS § 160.390 ("The superintendent . . . shall exercise general supervision of the schools in the district.").  The act of banning the Fleges in and of itself, therefore, does not constitute outrageous conduct.

However, it is possible that a reasonable jury could find that banning the Fleges to allegedly "shut them up" constitutes outrageous conduct, assuming Plaintiffs can prove that Defendants banned the Fleges from school grounds as a retaliatory measure.  Regardless, because Defendants "banning" conduct and the potential recovery therefrom is already subsumed by a number of Plaintiffs' other tort claims, namely the first amendment retaliation and abuse of process claims, a separate claim for "outrageous conduct" based solely on this conduct is not cognizable.  *See Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 298-99 (Ky. 1993); *Wilson*, 75 S.W.3d at 238-39; *Messick v. Toyota Motor Mfg.*, 45 F. Supp. 2d 578, 582 (E.D. Ky. 1999).

Accordingly, because any relevant conduct of Defendants either fails to rise to the level of outrageous conduct or is subsumed by alternative tort claims, Defendants prevail as a matter of law and Count Eleven of Plaintiffs' Complaint is therefore dismissed.

-43-

### 6.     Negligent Supervision

In their Response to Defendants' Motion, Plaintiffs fail to address the claim in Count Twelve asserting that Supt. Wilson and the Board are liable for negligent supervision in their hiring and retention of Mr. Poer as Principal of WES.  *See Oakley v. Flor-Shin, Inc.*, 964 S.W.2d at 438, 442 (Ky. Ct. App. 1998) ("the established law in this Commonwealth recognizes that an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person."). The standard for a negligent supervision claims asks, in the present context: (1) whether Mr. Poer was unfit for his job as Principal; and (2) whether his placement and/or retention as Principal created an unreasonable risk of harm to Plaintiffs.  *See id.* (citing *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (1991)).

Plaintiffs have failed to put forth any evidence to establish the requisite elements for a negligent supervision claim.  Furthermore, even in the absence of any analysis by Plaintiffs, the record viewed in Plaintiffs' favor clearly demonstrates that a reasonable jury could not find that Mr. Poer was either unfit for his job or that he created an unreasonable risk of harm to Plaintiffs.  Accordingly, Defendants prevail as a matter of law and Count Twelve of Plaintiffs' Complaint is therefore dismissed.

### 7.     False Imprisonment

In their Response, Plaintiffs also fail to specifically address Count Thirteen Complaint, which alleges a claim of false imprisonment against Defendants for "unlawfully [confining] Plaintiffs . . . within the confines of a room designated for in-school suspension at WES."  The tort of false imprisonment "requires the plaintiff to establish that she was detained unlawfully," where "any exercise of force, by which in fact the other person is

deprived of his liberty and compelled to remain where he does not wish to remain or to go where he does not wish to go, is an imprisonment." *Birdsong v. Wal-Mart Stores*, 74 S.W.3d 754, 757 (Ky. Ct. App. 2001).

Even in the absence of any Response from Plaintiffs' on their false imprisonment claim, the claim nevertheless fails for reasons similar to those delineated in the analysis of Plaintiffs' claim for unlawful detention and confinement *supra*. The Flege children were not assigned to the ABC room unlawfully.[20]  The moment the Flege children arrived to school on May 16, 2005, they were in WES's lawful custody.   This provides the school administrators with authoritative and disciplinary discretion to determine where the children are to be located during the school day.  The children were never forced to remain in the ABC room when Mrs. Flege arrived at the school to withdraw her children.  The moment she was present to retain custody of her children, the school relinquished said custody. Accordingly, the Flege children having not been falsely imprisoned by Defendants, and a reasonable jury not capable of finding otherwise, Defendants prevail as a matter of law and Count Thirteen of Plaintiffs' Complaint is therefore dismissed.

---

[20] Plaintiffs do not at any point in their Response question the "lawfulness" of the in-school suspension in relation to KRS § 158.150(8).  Although the relevant statute prohibits suspension for elementary age students, absent matters of child safety, there is no indication that the in-school suspension utilized by WES, wherein children simply do their work in an alternative classroom, is at all akin to traditional suspension where children are prohibited from attending school on the proscribed days.  Thus, this issue has no bearing on whether the ABC room assignment was "lawful."

## IV.   CONCLUSION

In accordance with the foregoing, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1)    Defendants' Motion for Summary Judgment (Doc. # 30) be, and hereby is,

**GRANTED IN PART** as to Counts Three through Thirteen of Plaintiffs'

Complaint, and **DENIED IN PART** as to Counts One and Two of Plaintiffs'

Complaint ; and

(2)    Counts Three through Thirteen of Plaintiffs' Complaint (Doc. # 1) be, and

hereby are, **DISMISSED WITH PREJUDICE**.

This 1st day of March, 2007.

Signed By:

_David L. Bunning_  DB

United States District Judge

G:\DATA\Opinions\2-06-47 Flege (MOO).wpd

-46-